## PENNSYLVANIA SHIP SUPPLY, INC.,

v.

## FLEMING INTERNATIONAL, LTD.

No. CIV.A.99–2418.

United States District Court,
E.D. Pennsylvania.

Sept. 11, 2000.

Daniel J. Dugan, Kelly R. Ramsdell, Spector, Gadon and Rosen, P.C., Philadelphia, PA, for plaintiff.

Michael J. McCaney, Jr., Flamm, Boroff and Bacine, Blue Bell, PA, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT F. KELLY, District Judge.

Plaintiff, Pennsylvania Ship Supply, Inc. ("Penn Ship"), filed this Amended Complaint on, setting forth five (5) separate Counts against the Defendant, Fleming International Limited ("Fleming"). Counts I and II of the Amended Complaint alleged conversion, fraud and misrepresentation. Counts III, IV and V [misdesignated as Count IV] all alleged breach of contract.

On June 9, 2000, this Court issued a Memorandum and Order dismissing Counts I and II. The three remaining Counts were tried to the Court without a jury on July 18, 2000. From the testimony and exhibits taken and submitted at that time, I make the following:

## FINDINGS OF FACT

1. Plaintiff, Pennsylvania Ship Supply, Inc. ("Penn Ship") is a Pennsylvania corporation having its principal place of business at 402 East Pennsylvania Boulevard, Feasterville, PA 19047.

2. Defendant, Fleming International, Ltd. ("Fleming") is an Oklahoma corporation having its principal place of business at 6301 Waterford Boulevard, Oklahoma City, OK 73126.

3. Fleming Companies, Inc. is the successor by merger to Fleming International, Ltd.

4. Fleming Companies, Inc. is an Oklahoma corporation having its principal place of business at 6301 Waterford Boulevard, Oklahoma City, OK 73126.

5. Fleming operates a division in Miami, Florida (Miami division) at 3400 N.W. 74th Avenue, Miami, FL 33122.

6. Following the merger of Fleming International, Ltd. into Fleming Companies, Inc., the Miami division of Fleming became responsible for transactions arising from Fleming International, Ltd.

7. Penn Ship filed a complaint on May 11, 1999 invoking the diversity jurisdiction of this Court under 28 U.S.C. § 1332(a).

8. An Amended Complaint was filed on September 15, 1999.

9. Penn Ship alleged claims against Fleming at Count I for Conversion; Count II for Fraud and Misrepresentation; Count III for Breach of Contract; Count IV for Breach of Contract; and Count V for Breach of Contract (Count V is mislabeled Count IV).

10. Pursuant to the Order of May 9, 2000, partial summary judgment was entered in favor of Fleming on Counts I and II for conversion, fraud and misrepresentation. (See this Court's Memorandum Opinion filed May 9, 2000).

11. Penn Ship and Fleming entered into a series of transactions relating to the sale of food and food related products to companies in Russia.

12. Count III of the Amended Complaint for breach of contract alleges that Penn Ship introduced Fleming to business entities in Kamchatka, Russia in exchange for a percentage of Fleming's sales to such entities of 25%.

13. The only company which Penn Ship has identified as such an entity is Holkam.

14. Penn Ship had commenced sale to Holkam in 1993 with a supplier other than Fleming (Fleming 19, P–1).

15. January 14, 1994 was the first time Penn Ship sold goods to Holkam which were supplied by Fleming (Fleming 19, P–1).

16. The general mode of business between Penn Ship and Fleming was that Penn Ship would purchase goods from Fleming and sell them to Holkam. Goods would be shipped directly from Fleming to Holkam. Payment would be made by Holkam to Penn Ship. Penn Ship would pay Fleming after it had taken its margin.

17. At the request of Penn Ship, Fleming would provide to Penn Ship invoice amounts for Holkam showing an additional 20% of cost so that Penn Ship could justify its charges to Holkam.

18. Penn Ship would receive invoices from Fleming for the cost of goods to Penn Ship, without the additional margin for the prices charged by Penn Ship to Holkam.

19. On February 4, 1994, after Penn Ship and Fleming had already commenced doing business for sales to Holkam, Fleming provided to Penn Ship a document entitled "Exclusive Buying Agreement" (Fleming 1, P–2). N.T. 69.

20. The Exclusive Buying Agreement did not apply to sales to Holkam.

21. At trial, the president of Penn Ship, Arie Ehieli, testified that he felt the Exclusive Buying Agreement applied to all companies in Russia, including Holkam.

22. At one point, Mr. Ehieli testified at trial that if Fleming was doing business with Penn Ship for sales to Holkam before the exclusive buying agreement, the exclusive buying agreement would not apply to sales to Holkam. On redirect, he seemed to say that it did apply to Fleming. His Testimony on this issue was evasive and conflicting. N.T. 92–93, N.T. 132–134.

23. The Exclusive Buying Agreement clearly indicates it applies to business in

the future regarding introduction of buyers/customers to Fleming (P–2).

24. The Exclusive Buying Agreement requires that Penn Ship register with Fleming, in writing, in advance, any customers/buyers subject to it. (P–2, Paragraph 3).

25. There was no written registration of Holkam as a customer subject to the Exclusive Buying Agreement, either in advance of business with Holkam, or after.

26. The Exclusive Buying Agreement provided that "prior to the acceptance of any particular transaction, Fleming will confirm in writing to Pennsylvania Ship Supply the amount of compensation." (P–3, Paragraph 5).

27. There was no writing from Fleming to Penn Ship confirming the amount of compensation regarding the sales to Holkam.

28. On September 1, 1994, Penn Ship wrote to Fleming addressing its relationship with Fleming (Fleming 19, P–1).

29. There was no reply or confirmation from Fleming to Penn Ship following the letter of September 1, 1994.

30. The letter of September 1, 1994 addresses Holkam and states that Penn Ship is Holkam's "exclusive agent" . . . "conditional upon an agreement being signed between Fleming and PSS." This language indicates that there was no existing agreement between Fleming and Penn Ship regarding "exclusivity."

31. In the letter of September 1, 1994, Penn Ship writes that the letter is a "structure for our relationship, as I see it." Penn Ship anticipated a draft of a written agreement with a counterproposal from Fleming.

32. In October of 1994, Wayne Epperson became President of Fleming International, Ltd.

33. In January 1995, Wayne Epperson met with Mr. Ehieli.

34. Following their meeting, Mr. Epperson wrote to Mr. Ehieli on January 27, 1995 (Fleming 5).

35. At the meeting with Mr. Ehieli, Mr. Epperson discussed with him, as confirmed in the letter (Fleming 5), the proposed structure of an agreement between Fleming and Global Import–Export, Inc.

36. There was no agreement regarding "exclusivity" of Holkam.

37. On February 2, 1995, Mr. Ehieli wrote a letter to Mr. Epperson on the letterhead of Pennsylvania Ship Supply, Inc. (Fleming 6), responding to the letter of July 27, 1995 from Mr. Epperson (Fleming 5). In his letter of February 2, 1995 (Fleming 6), Mr. Ehieli confirmed that there was no contract in existence at that time stating "I do hope that we can come to acceptable terms in a contract so our relationship will be a long standing and prosperous one."

38. Fleming drafted a written agreement which was sent to Mr. Ehieli. He would not sign it because he did not like it.

39. There was never any meeting of the minds regarding an "exclusive" sales arrangement between Penn Ship and Fleming.

40. Fleming's customer was Penn Ship, not Holkam.

41. Penn Ship identified one transaction with Holkam (Holkam Order No. 6) where, at the direction of Penn Ship, Holkam paid Fleming directly and not through Penn Ship. It is unclear whether Holkam was invoiced directly from Fleming

42. Penn Ship could not identify any other transactions through mid 1995 where Fleming billed directly or received payment directly from Holkam.

43. Penn Ship does not claim any payment due for any transactions with Holkam prior to that time when Fleming ceased doing business with Penn Ship for sales to Holkam in mid 1995.

44. As of May 10, 1995, Penn Ship had a balance due Fleming of $667,235.00, which was above the credit limit terms (Fleming 13). At that time, the account of Penn Ship was placed on hold.

45. In about May 1995, Wayne Epperson spoke to Mr. Ehieli, President of Penn Ship, and told him unequivocally that Fleming would not do further business with sales to Penn Ship unless and until payment was received on all outstanding accounts receivable.

46. As late as April 18, 1996 (approximately eleven months after the Penn Ship account was placed on hold), Penn Ship continued to owe Fleming $124,106.00 (Fleming 14). N.T. 179.

47. Penn Ship never paid its balance due to Fleming.

48. Fleming eventually wrote off significant amounts due from Penn Ship, as bad debt.

49. Wayne Epperson believed that Mr. Ehieli, President of Penn Ship, was deceptive. N.T. 180, 185.

50. It was difficult doing business with Penn Ship, because its President, Mr. Ehieli, was continuously confused and confusing, constantly running transactions together. For example, Exhibit P–9 shows multiple partial payments for Holkam order no. 9, which are beyond thirty days from the invoice date, and which do not accumulate to a total payment. N.T. 161.

51. In early 1995, Penn Ship transferred some of its business to Global.

52. After March 11, 1995, there is no document which shows a payment from Penn Ship to Fleming, or an order from Holkam to Penn Ship. All orders and payments were through Global.

53. Approximately six to twelve months after Penn Ship was notified Fleming would not continue to do business with it, and while Penn Ship continued to owe Fleming substantial sums of money, Fleming did business directly with Holkam, at the request of Holkam. N.T. 162, 163.

54. In Count IV of its Amended Complaint for breach of contract, Penn Ship claims 3% of sales by Fleming for container shipments to IBPT, Inc. in Vladivostok.

55. On July 18, 1995, Fleming wrote to Mr. Ehieli confirming that Fleming would pay 3% on all orders to IBPT, Inc. (Fleming 4, P–18).

56. Penn Ship was not the customer on sales to IBPT, Inc. Fleming had agreed to pay to Penn Ship (or Global) 3% of the sales made by Fleming to IBPT, Inc. where IBPT, Inc. was the customer of Fleming.

57. The only sales to IBPT, Inc. which could be identified were sales of approximately $29,000.00 in 1996. N.T. 170.

58. Three per cent of the sales to IBPT, Inc. is $870.00.

59. In 1996, Penn Ship continued to have a balance due Fleming in excess of $124,000.00 (Fleming 14). N.T. 179.

60. No sales to any company other than Holkam or IBPT, Inc. have been identified.

61. In Count V of the Amended Complaint for breach of contract (misidentified as Count IV), Penn Ship alleges an agreement in 1995 whereby Fleming would pay to Penn Ship a commission of 3% on sales by Fleming to customers in Vladivostok, Russia, where such customers had been introduced by Penn Ship to Fleming at a Food Exhibition which took place in 1995.

62. Penn Ship has not identified any sales or transactions which would give rise to the payment of a commission to Penn Ship from Fleming as alleged in Count V.

63. A review of the records of Fleming by the controller of the Miami division of Fleming revealed that there were no records of any sales or transactions to any entities identified by Penn Ship, other than Holkam and IBPT, Inc.

64. Penn Ship had the opportunity, through discovery, to examine the records of Fleming in regard to sales by

Fleming International, Ltd. during the relevant time frames (mid 1990s). Although Penn Ship made a Request for Production of Documents just prior to the close of discovery, which was disputed as unenforceable, Fleming nonetheless served Objections and Response to Request for Production of Documents to Defendant and identified approximately 240 boxes of documents, primarily hard copies of invoices, which were stored at the Miami division of Fleming, and which were available for inspection by Penn Ship.

## CONCLUSIONS OF LAW

1. All parties agree that Pennsylvania law applies to the determination of the issues involved in this litigation.

2. Penn Ship is not entitled to an "accounting."

3. Penn Ship was not the exclusive distributor, on behalf of Fleming, of products to Holkam.

4. Penn Ship was a customer of Fleming who purchased goods from Fleming and sold them to Holkam.

5. Penn Ship has failed to establish sales to any business entity in Kamchatka, Russia to which it would be entitled to a 25% commission as alleged in Count III. Penn Ship has, therefore, failed to prove its claim as to Count III of the Amended Complaint.

6. In support of its allegations in Count IV for breach of contract, Penn Ship has established that Fleming engaged in sales of $29,000 to IBPT in 1996 to which it would be entitled to a commission of 3% ($870.00).

7. Although Fleming produced evidence that indicated that Penn Ship owed Fleming in excess of $124,000.00, which Fleming had written off, no counterclaim was filed by Fleming.

8. Penn Ship has failed to establish sales to customers in Vladivostok, Russia introduced to Fleming in conjunction with the Food Exhibition which took place in 1995 as alleged in Count V (misidentified as Count IV). Penn Ship has failed to prove its claim set forth in Count V of the Amended Complaint.

## DISCUSSION

■■■ An accounting is an equitable remedy which is available only when there is no adequate remedy at law. *Benefit Control Methods v. Health Care Services, Inc.*, 1998 WL 22080 (E.D.Pa.1998, Broderick, J). The information which plaintiff sought by way of an accounting are documents which were readily attainable through the discovery process. Plaintiff apparently chose not to review defendant's documents in Miami, Florida. *See* Plaintiff's Motion to Enforce Discovery Requests. Plaintiff did, however, call as a witness Brent Kemper who testified that he is the person in charge of records relating to international import/export business conducted by Fleming from the Pleasanton, California office. N.T. 168. He reviewed the records and discovered only the sale of $29,000 to IBPT. N.T. 170. He was then asked by Ms. Ramsdell, on direct:

Q. When you were reviewing the record, did you notice any sales to Fleming to any of the other companies which Mr. Ehieli identified during his testimony on the stand today?

A. No Ma'am

N.T. 170.

For these reasons, Plaintiff's claim for an accounting is denied.

■■■ Count III of the Amended Complaint sets forth a claim for commissions for sales to business entities in Kamchatka, Russia. Holkam is the only company Penn Ship was able to identify at trial as a company in Kamchatka to which such sales were allegedly made.

Penn Ship originally made sales to Holkam in 1993 with a supplier other than Fleming (Fleming 19, P–1). In January 1994, for the first time, Penn Ship sold goods to Holkam which were supplied by

Fleming. Penn Ship would purchase goods from Fleming and sell them to Holkam. These goods would be shipped directly from Fleming to Holkam. Payment would be made by Holkam to Penn Ship, thereafter, Penn Ship would pay Fleming after it had taken its margin. Holkam was the customer of Penn Ship. Plaintiff contends that Fleming had agreed to sell goods for Holkam only through Penn Ship. Testimony offered in support of this proposition was that of Arie Ehieli, President of Penn Ship. Mr. Ehieli's testimony as to the "exclusive" agreement is contradicted by the documents admitted at the trial.

Penn Ship offered a document entitled "Exclusive Buying Agreement" dated February 4, 1994 (Fleming 1, P–2). This document was executed after Fleming had already sold to Penn Ship as the middle man for Holkam. At trial, Mr. Ehieli testified that he felt that the "Exclusive Buying Agreement" applied to all businesses in Russia, including Holkam. In another part of his testimony, however, he indicated that if Fleming was already doing business with Penn Ship for sales to Holkam, the Exclusive Buying Agreement would not apply to Holkam. From the conduct of the parties and the testimony at trial, I find that Penn Ship has failed to establish that it was the exclusive middle man for sales to Holkam.

Count IV of the Amended Complaint is a claim to commissions of 3% for container shipment to IBPT, Inc. in Russia. I find from the testimony established at trial that the only credible evidence establishes that sales to IBPT, Inc. in 1996 amounted to $29,000.00. Three per cent of $29,000 is $870.00. Therefore, that amount is due Penn Ship.

Count V of the Amended Complaint claimed a 3% commission on sales to customers in Vladivostok, Russia where such customers were identified by Penn Ship at a Food Exhibition conducted in May of 1995. Penn Ship failed to offer evidence of any such sales to these customers at trial. Therefore, that Count is dismissed.